

IN THE
TENTH COURT OF APPEALS

No. 10-17-00114-CV

ELSA LAURA JUAREZ,

Appellant

 v.

PAUL HAMMETT,

Appellee

From the 361st District Court
Brazos County, Texas
Trial Court No. 15-001212-CV-361

## MEMORANDUM  OPINION

Elsa Laura Juarez appeals from the trial court's final judgment on the jury's verdict in favor of Paul Hammett in this case.  In her sole issue, Juarez contends that the trial court abused its discretion in denying her motion for new trial, which was based, in relevant part, on newly discovered evidence.  We will reverse and remand.

### Background

Juarez and Hammett were involved in a motor vehicle accident.  Hammett sued Juarez, alleging that her negligence caused the accident and his resulting injuries.  Juarez

denied Hammett's allegations, and the case proceeded to a jury trial. On the morning of the first day of trial, Hammett's counsel orally requested that the trial court grant a continuance of the trial because Hammett was unable to be there. The trial court denied the motion for continuance, and the jury trial was conducted in Hammett's absence. The evidence presented at the jury trial consisted of several exhibits, including Hammett's medical and billing records pertaining to his treatment following the accident, and the testimony of three witnesses—Juarez; Hammett, whose testimony was introduced by the parties through his deposition testimony; and Dr. Remon Fino, a licensed medical doctor board certified in physical medicine rehabilitation who treated Hammett at his practice about seven months after the accident. The following is an account of the substance of the relevant evidence.

On December 16, 2014, fifty-three-year-old Hammett was driving his motorcycle on a parking lot roadway when Juarez, who was driving her car, exited a restaurant parking lot onto the roadway where Hammett was driving and collided with him. Neither Hammett nor Juarez had a stop sign. Juarez testified that she had nevertheless stopped and looked before exiting the restaurant parking lot but that she had not seen Hammett approaching from her left. The impact was to the left, front corner of her car. Hammett testified that when the collision occurred, he was "plowed roughly to the left," resulting in his motorcycle being laid down on its right side. Hammett, who was not wearing a helmet, struck his head on the left side of Juarez's car as he fell to the ground. Hammett said that his right leg was then pinned under the motorcycle but that he was

able to pull himself out from under the motorcycle without help. He suffered bruises and scratches to his right arm and leg.

Juarez stated that after the collision occurred, she got out of her car and saw Hammett lying on the ground. Hammett asserted that Juarez began apologizing profusely and told him that she had not seen him. Juarez testified that she called 911 but that she was told that because the accident had occurred on private property, no one would be dispatched to the scene unless the collision had caused injury. Juarez asked Hammett if he was hurt. Hammett replied that he was fine, so Juarez ended the call.

Juarez stated that a passerby thereafter helped Hammett pick up his fallen motorcycle and move it over to the parking area. Juarez also asserted that during her time at the accident scene, she had asked Hammett several more times if he was hurt so that she could call an ambulance for him, if necessary. Each time that she asked, he told her that he was okay. Juarez and Hammett ultimately exchanged information, and Juarez asked Hammett if he needed a ride somewhere. Hammett declined and stated that he was waiting for someone. Hammett testified that a friend eventually arrived to pick him up and that his friend then took him to the emergency room.

Hammett's medical records show that when he arrived at the emergency room, he reported to the medical personnel that it had been about an hour since he had been involved in the accident. Hammett generally described the accident to the medical personnel and then specifically stated to a nurse, "The shock is starting to wear off, so I'm starting to feel more." Hammett then complained that he was experiencing right head pain, blurry vision, right shoulder blade pain, right knee pain, and minor tenderness and

stiffness in his neck. Hammett noted, however, that he had not lost consciousness at the accident scene and that he had not had any nausea or vomiting since the accident.

Dr. Fino did not treat Hammett that day; nevertheless, he testified that he is not concerned by Hammett going to the hospital about an hour after the accident instead of taking an ambulance from the scene. Dr. Fino explained that he does not think that Hammett's actions exacerbated his injuries. Dr. Fino said that Hammett's statement to the nurse about the shock wearing off is also normal because such a traumatic accident will cause that kind of experience.

Hammett's medical records show that based on his complaints to the medical personnel at the emergency room, Hammett had several CT scans performed that day, including scans of his head, cervical spine, thoracic spine, lumbar spine, chest, abdomen, and pelvis, to look for any injuries. Dr. Fino testified that he believes that those tests are "routine" for the kind of trauma that Hammett experienced. Dr. Fino explained that with a motorcycle accident, there does not have to be major damage to the vehicles for the motorcycle rider to have been injured. Hammett's medical records additionally show that while at the emergency room, Hammett was given two injections of Dilaudid, which Dr. Fino described as a strong, potent narcotic pain medication. Dr. Fino explained that Hammett probably received the second injection because the first injection did not provide enough pain relief or because the pain relief that Hammett experienced from the first injection had worn off. Hammett was also given a medication to help with nausea because nausea is a common side effect of narcotic medication.

Hammett's medical records show that after the extensive examination, Hammett was ultimately given the final diagnoses of motor vehicle accident, headache, and concussion without loss of consciousness. Hammett was instructed that some of his musculoskeletal complaints would worsen over the next couple of days, which Dr. Fino confirmed is normal. Dr. Fino explained that in many instances, inflammation and swelling will develop over time as a person starts to move more. Hammett's medical records reveal that Hammett was therefore prescribed Norco (hydrocodone and acetaminophen), which Dr. Fino described as a narcotic medication for "strong, moderate, severe pain." When Dr. Fino was asked if he believed that that was "consistent with what [Hammett] presented on," Dr. Fino replied, "Yes." Hammett's medical records show that before Hammett was discharged from the emergency room, he was also given postconcussive instructions and that he agreed to follow up with his primary care physician if any symptoms persisted. Dr. Fino stated that it is normal for the hospital to have told Hammett to follow up with his primary care physician.

On December 17, 2014, Hammett followed up with his primary care physician, Dr. Jorge Sanchez. On December 24, 2014, Hammett then consulted with orthopedic specialists for evaluation and treatment of his persisting right knee pain. Hammett's medical records show that he explained to an orthopedic physician assistant that day that he had been "side swiped" one week earlier while riding his motorcycle, which had caused him to be "thrown from the bike." Hammett explained that as a result of the accident, he had sustained a head injury without loss of consciousness but that even though a CT scan of his head had been normal, he was still experiencing a worsening

headache and blurry vision. Hammett also reported that as a result of the accident, he had sustained a right knee injury and that he was still experiencing pain mostly on the outside of the knee, which was made worse by bearing weight on his leg.

Hammett's medical records show that X-rays and an MRI of his right knee were obtained and evaluated. Dr. Fino testified that the X-rays revealed an irregularity or defect on the end of Hammett's right femur where the bone contacts the outside of the knee. The MRI further showed a lateral meniscus tear (a tear in the soft tissue structure that helps stabilize the outside of the knee), a possible medial meniscus tear (a possible tear in the soft tissue structure that helps stabilize the inside of the knee), and irregularity of the bone on the outside of the knee. Hammett's medical records provide that the MRI results were thereafter reviewed with Hammett and that he was to follow up with an orthopedic surgeon the next week to discuss treatment plans and possible surgery. Dr. Fino opined that from his review of the MRI, he agreed that referring Hammett to an orthopedic surgeon was the correct course of action. Hammett's medical records show that Hammett was told that in the meantime, he needed to go to the emergency room if his headache, blurry vision, and concussion-type symptoms worsened.

A few hours later that same day, Hammett went to the emergency room. Hammett's medical records show that his chief complaint at that time was that he was suffering from a severe headache that had been ongoing since the accident. Hammett complained that he was also experiencing mild nausea and photophobia, which Dr. Fino defined as a hypersensitivity to light. Hammett noted to the medical personnel, however, that he was not experiencing dizziness, blurred vision, or vomiting. He further reported

that he had not taken any medication for his pain other than NSAIDs because he had not yet been able to fill his prescription for Norco.

Hammett's medical records show that while at the emergency room, he was given an injection of Dilaudid to treat his pain, as well as medication to help with nausea. Even though the CT scan of his head from one week earlier had been negative for bleeding, another CT scan of his head was performed to ensure that there was no bleed. The result of the second CT scan was again negative. Hammett's neurological exam was also normal. Hammett was therefore diagnosed with post-concussion syndrome. Dr. Fino explained that post-concussion syndrome is "basically when somebody has a head injury." Dr. Fino expounded that when someone suffers a concussion, it can result in headaches from the day of the concussion up to several months and even years later; the trauma to the head can also result in blurred vision and photophobia. Hammett's medical records show that before being discharged, Hammett was therefore prescribed oxycodone, which Dr. Fino described as another "narcotic pain medicine for moderate to severe pain."

On December 29, 2014, Hammett again followed up with Dr. Sanchez, who noted in the medical records at that time that Hammett had sustained a stress fracture in his right knee and that he was scheduled to see an orthopedic surgeon for consideration of knee surgery. Dr. Sanchez additionally noted that he would refill Hammett's Norco prescription to treat Hammett's knee pain and that he recommended mental rest for Hammett's concussion.

On December 31, 2014, Hammett then went to see orthopedic surgeon Dr. Thomas O'Shea. Dr. Fino asserted that Hammett's description of his injury at that time is consistent with a stress or compression fracture. Hammett's medical records from the visit show that Hammett described to Dr. O'Shea that he was suffering from aching right knee pain. Hammett reported that the pain had been improving since its onset, but he ranked the severity of his pain on that day as six out of ten. Hammett also noted that his symptoms were aggravated by weight bearing, movement, and palpitation.

Hammett's medical records show that based on the MRI imaging, Hammett was assessed as having a fracture of his right distal femur at that time. Dr. Fino explained that the distal femur is considered the top part of the knee and that it is therefore consistent to say that part of the knee sustained a fracture. Dr. Fino further stated that the fracture as shown in the MRI imaging is consistent with the previous imaging that showed irregularity on the end of Hammett's right femur. Dr. Fino testified that in his opinion, based on reasonable medical probability, the distal femur fracture shown in the MRI imaging was a result of the December 16 motor vehicle accident.

Hammett's medical records show that based on his examination of Hammett, Dr. O'Shea ultimately concluded that surgery was not recommended at that time. Instead, Dr. O'Shea noted that he recommended taking another X-ray of Hammett's right knee in one month and that in the meantime, Hammett should use crutches.

On January 6, 2015, Hammett met again with Dr. Sanchez. Hammett's medical records indicate that Hammett was seeing Dr. Sanchez about pain management because Dr. O'Shea did not recommend surgery. Hammett described his right knee pain that day

as sharp, dull, and achy and stated that it was worse whenever he walked. Dr. Fino again testified that Hammett's description of his pain is consistent with his injury. Hammett's medical records show that Hammett was prescribed a fentanyl patch to treat his pain. Dr. Fino described fentanyl as another narcotic pain medication for moderate to severe pain and explained that the medication is absorbed through a patch that is placed on the body. Dr. Sanchez noted in Hammett's medical records that Hammett was also to continue using hydrocodone as needed and then to return in two weeks for continued pain management.

On January 11, 2015, Hammett again went to the emergency room, complaining mainly about an uncontrollable headache. Hammett's medical records show that he reported at that time that he had suffered from intermittent migraine headache pain located behind his right eye since the accident. Hammett further explained that the headache was sometimes associated with weakness of his right lower leg, but the doctor noted that during his physical examination of Hammett, right-side weakness was not appreciable. Dr. Fino stated that that did not mean that Hammett was lying, though. Dr. Fino explained that a head injury can cause people to have different feelings in their arms and legs, and what seems like weakness could be heaviness that the person is confusing with weakness.

Hammett's medical records show that Hammett then reported that his current headache had slowly started about four days before and that the headache was associated with mild nausea and photophobia. Hammett explained that four days before, he had been wearing a fentanyl patch that he had been prescribed to treat his pain from the

accident but that he thought that instead of helping his headache, the fentanyl patch had caused the headache. Hammett had therefore removed the patch. Hammett further explained that about a week before, he had also stopped taking the Norco that he had been prescribed to treat his pain from the accident because it was making him vomit. Dr. Fino confirmed that fentanyl is a narcotic, a side effect of which includes headaches, and that Norco, also a narcotic, can cause nausea and vomiting. Hammett's medical records reveal that Hammett ultimately described how he felt that day by stating, "[E]verything is screaming right now."

Hammett's medical records show that after being evaluated, Hammett was diagnosed with a migraine. Hammett was given a Benadryl and Compazine cocktail, after which he reported that his pain symptoms had improved. Although Hammett was not completely pain-free, he expressed a desire to go home and was discharged at that time.

On January 12, 2015, Hammett again followed up with Dr. Sanchez. Hammett's medical records show that Hammett reported at that time that his pain was uncontrollable. Dr. Sanchez noted in the medical records that Hammett was having difficulty sleeping. Dr. Sanchez also recorded that Hammett had been instructed to offload his weight from his right knee by using crutches but that Hammett had been unable to use the crutches because of right shoulder pain. Hammett had recently started using a fentanyl patch to treat his pain, as well as taking Norco for breakthrough pain, but Hammett reported that the medications had caused a severe migraine that required him to visit the emergency room. Hammett further reported that despite going to the

emergency room, he was continuing to suffer from a pulsatile headache along with nausea and vomiting. Dr. Fino testified that Hammett's headache, nausea, and vomiting were related to the post-concussion syndrome.

Hammett's medical records show that because Hammett was not tolerating the hydrocodone or fentanyl patch well, Dr. Sanchez instructed him to stop taking those medications. Dr. Sanchez instead prescribed Lidoderm. Dr. Fino stated that Lidoderm is a pain patch like a fentanyl patch but that Lidoderm is applied directly to the specific area where the pain is located (in this case, Hammett's right knee), and it releases the numbing pain medication lidocaine, a non-narcotic, into the area of pain. A fentanyl patch, on the other hand, is applied somewhere other than the location of the pain, and it causes narcotic pain medication to be absorbed into the bloodstream. Hammett was also prescribed Percocet (oxycodone and acetaminophen), which Dr. Fino described as a narcotic pain medication for moderate to severe pain. When asked why Percocet would be tried when Norco was causing nausea, Dr. Fino explained that Percocet and Norco are both synthetic narcotics but that they have different chemical structures. Consequently, one medication might cause a person to have headaches while the other causes no side effects. Finally, Hammett was given a Kenalog-40 injection for his right shoulder joint pain. Dr. Fino explained that Kenalog is a short-acting steroid that was injected into Hammett's shoulder to help with the pain, inflammation, and swelling.

Hammett's medical records indicate that in addition to prescribing the foregoing medications, Dr. Sanchez recommended that Hammett start using a rehabilitation brace to prevent movement while he slept. Dr. Sanchez also recommended that Hammett

attempt again to use the crutches, and he noted that he would refer Hammett to pain management.

On January 14, 2015, Hammett therefore went to see anesthesiologist Dr. Nicholas McKernan. Hammett's medical records show that at that time, Hammett complained of pain in his lower back, head, right shoulder, right leg, and right knee. Hammett further stated that his pain had started on the day of the motor vehicle accident. Hammett described the pain as both numb and sharp. He further reported that the pain worsened with movement but that it was not radiating. Hammett also ranked the severity of his pain as six out of ten, which, according to Dr. Fino, is important because the pain is not mild; rather, it is in the moderate range of pain. Hammett's medical records show that Hammett further reported that medication and heat lessened the pain. Hammett said that his pain medication at that time included Percocet and BC Powder, which provided about sixty percent pain relief. Hammett denied any problems with substance abuse.

Hammett's medical records show that upon physically examining Hammett, Dr. McKernan noted that Hammett had myofascial pain throughout the region near his neck and shoulder. Dr. Fino explained that myofascial pain indicates that the muscle is what is generating the pain. Hammett's medical records also indicate that Hammett exhibited decreased range of motion and tenderness in his cervical back and right knee. Dr. McKernan accordingly noted that his assessment was that Hammett suffered from myofascial muscle pain, lower back pain, and right shoulder pain resulting from the motor vehicle accident. Dr. Fino testified that these pain issues are the same kind of pain issues for which he later saw Hammett.

Hammett's medical records show that Dr. McKernan treated Hammett's myofascial muscle pain with a total of five trigger-point injections, which Dr. Fino testified is normal. Dr. Fino explained that when there is an injury, the muscle tends to knot up as a self-defense mechanism, creating a trigger point that causes myofascial pain. Dr. Fino stated that trigger-point injections work by taking a small needle, inserting it into the knot, and breaking up the knot mechanically.

Hammett's medical records show that during the appointment, Dr. McKernan further discussed the natural course of Hammett's injury with him and reviewed realistic expectations of pain management with him. Dr. McKernan also provided Hammett with a one-time prescription for Percocet. Hammett's medical records specify that Hammett understood that as he recovered from the injury, his use of the Percocet should decrease and that long-term opioid prescriptions were not anticipated. After the trigger-point injections, Hammett was also advised by Dr. McKernan to continue his home exercise and stretching program and to follow up with a physical therapist. Dr. Fino opined that a home exercise program is normally indicated but that the home exercise program did not seem to be helping Hammett's pain because Hammett was continuing to have pain when Dr. Fino later saw him.

On January 15, 2015, Hammett went to see Dr. B. Rick Seabolt for a second opinion about his right knee, which Dr. Fino testified is normal. Hammett's medical records show that Hammett generally explained to Dr. Seabolt his history of medical care since the accident and then explained that he was still suffering from muscle pain, joint stiffness, back pain, shoulder pain, and lateral knee pain. Dr. Fino testified that in his experience,

Hammett's knee injury is something that would cause significant pain and could mask other issues.

Hammett's medical records show that after reviewing the X-rays and MRI of Hammett's knee, Dr. Seabolt's assessment was that Hammett was suffering from a traumatic bone contusion. More specifically, Dr. Seabolt noted that Hammett had a contusion of his lateral femoral condyle. Dr. Seabolt also opined that there was evidence on the MRI of small free-edge meniscus tears, but Dr. Seabolt did not think that those were significantly contributing to Hammett's symptoms at that point.

Dr. Fino testified that a traumatic bone contusion is a bone injury caused by a large impact trauma that results in swelling, edema, and pain. Dr. Fino agreed that Dr. Seabolt had a slightly different opinion than Dr. O'Shea in that Dr. Seabolt believed that Hammett suffered a *contusion* of his lateral femoral condyle and Dr. O'Shea believed that Hammett suffered a distal femoral *fracture*. Dr. Fino explained that the different opinions, however, did not matter with regard to the treatment options; both conditions are related to large traumas and are related pain conditions.

Hammett's medical records show that Dr. Seabolt discussed with Hammett that traumatic bone contusions can take from eight to twelve weeks to feel significantly better. Dr. Fino highlighted that Hammett's injury was complicated and aggravated, however, by weak muscles. Dr. Seabolt noted in Hammett's medical records that Hammett had considerable weakness in his right leg and that Dr. Seabolt would recommend physical therapy for strengthening Hammett's muscles. Dr. Fino explained that the knee is supported by muscles and that strengthening the muscles during physical therapy helps

lessen the knee pain and prevent more injury. Hammett's medical records further show that Dr. Seabolt discussed with Hammett that he should avoid impact activities. Dr. Seabolt told Hammett that walking was okay but that significant walking would be detrimental, with which Dr. Fino stated that he would agree. Hammett's medical records further specify that Hammett understood the foregoing plan and that he was in agreement with it.

On January 20, 2015, Hammett again followed up with Dr. Sanchez. Hammett's medical records show that at that time, Hammett had been able to control his pain well by taking Percocet and using Voltaren cream. Dr. Fino testified that Voltaren cream is an anti-inflammatory medicine combined with a product that allows it to be absorbed through the skin into the joint where it is applied; in Hammett's case, it was applied to his right knee to help reduce inflammation and pain. Hammett's medical records show that Hammett was also weaning himself off of the Percocet; he had noticed that he was not requiring as much pain medication. When Dr. Fino was asked what he thought of that, he stated that he guessed that Hammett was feeling less pain and that Hammett had therefore cut back on taking the Percocet. Dr. Fino asserted that that did not mean that Hammett was failing to comply with his doctor's orders, however. Dr. Fino attested that Hammett's actions were to be expected.

Hammett's medical records show that Dr. Sanchez's assessment at that time was that Hammett's knee pain had improved, he was able to function, and it was okay for him to return to work. Dr. Fino testified that he would agree with that assessment. Dr.

Fino stated that from the records, his assessment of Hammett at that time was that Hammett's knee was the main focus and that there was improvement in his knee pain.

On July 13, 2015, Hammett then went to see Dr. Fino for the first time. Dr. Fino acknowledged that there was a gap in Hammett's care before Hammett came to see him, but Dr. Fino asserted that in his practice, that is common. Dr. Fino explained that he has seen many patients who, depending on their pain thresholds, avoid doctors until their problems worsen.

Hammett's medical records show that when Hammett did finally see Dr. Fino, he reported multiple pains. His main complaint was low back pain, followed by neck pain, and then knee pain. Dr. Fino stated that Hammett's low back pain and neck pain were consistent with what Hammett had reported on the day of the motor vehicle accident. Dr. Fino further confirmed that it is common for someone's chief complaint to become his third complaint. Dr. Fino explained that when one thing improves (in this case, Hammett's knee pain), something else that was being masked (in this case, Hammett's low back pain and neck pain) starts to become an issue.

Hammett's medical records show that Dr. Fino addressed each of Hammett's complaints in turn that day. First, during his physical examination of Hammett's low back/lumbar spine, Dr. Fino noted that Hammett had mild decreased range of motion in all cardinal planes. Dr. Fino explained that that meant that all the motions of Hammett's low back, *e.g.*, bending and twisting, were less than expected. Based on his exam of Hammett and the history that Hammett provided, Dr. Fino concluded that Hammett's low back pain was bilateral, meaning on both sides, and that it had begun after the motor

vehicle accident. Hammett's medical records show that Dr. Fino started treating Hammett's low back pain with Ultram tablets, which Dr. Fino described as narcotic pain medication for moderate to severe pain. Dr. Fino also noted that he needed to obtain Hammett's past medical records and MRIs from Dr. Sanchez and the specialists who had already seen Hammett.

During his physical examination of Hammett's neck/cervical spine, Dr. Fino observed that there was normal curvature but that Hammett's range of motion was mildly decreased in all cardinal planes and that Hammett had myofascial trigger points. Dr. Fino testified that that meant that Hammett's neck movement was limited and that Hammett also felt tenderness when Dr. Fino touched certain muscles in his neck. Hammett's medical records further indicate that Hammett reported that his pain was of moderate severity at that time.

Based on his exam of Hammett and the history that Hammett provided, Dr. Fino concluded that Hammett was suffering from pain on the right side of his neck and that it was accompanied by shoulder pain and right hand numbness. Dr. Fino also concluded that Hammett's neck pain had begun after the motor vehicle accident. Hammett's medical records show that Dr. Fino did not start treatment for Hammett's neck pain that day, though. Dr. Fino acknowledged that he was still trying to figure out what was causing the pain. Dr. Fino noted that he needed to obtain Hammett's past medical records and MRIs from Dr. Sanchez and the specialists who had already seen Hammett.

Finally, during his physical examination of Hammett's knee, Dr. Fino observed that there was no swelling or redness and that Hammett's range of motion was normal.

Hammett did, however, have tenderness on the outside of the knee and felt pain when Dr. Fino moved his kneecap and pushed on it. Dr. Fino explained that that meant that there was an injury to the kneecap and/or any structure that might be touching it. Dr. Fino stated that it could also mean that there was muscle weakness causing the kneecap to track abnormally and to be painful. Hammett's medical records further indicate that Hammett reported that his pain was of moderate severity at that time. Hammett also told Dr. Fino that his knee pain was aggravated by prolonged activity and that he experienced relief when he laid down. Hammett additionally reported that he had had arthroscopic surgery on his right knee twelve years before with excellent results.

Based on his exam of Hammett and the history that Hammett provided, Dr. Fino concluded that Hammett was experiencing right knee pain with a kneecap fracture. Dr. Fino also concluded that in all medical probability, Hammett's knee pain had begun after the motor vehicle accident. Hammett's medical records show that as with Hammett's neck pain, Dr. Fino did not start treatment for the knee pain that day, though. Dr. Fino again only noted that he needed to obtain Hammett's past medical records and MRIs from Dr. Sanchez and the specialists who had already seen Hammett.

Dr. Fino acknowledged on cross-examination that he was tying Hammett's problems to the motor vehicle accident that day because Hammett had told him that his problems were related to the accident. Dr. Fino further conceded that if Hammett told him something incorrectly, then that would make his records and his diagnosis of Hammett incorrect. For instance, Dr. Fino acknowledged that when he thereafter received Hammett's past medical records from Dr. Sanchez and the specialists who had

already seen Hammett, he saw that some of the doctors had documented a fracture of Hammett's knee but that those doctors had not documented a fracture of the kneecap specifically. Dr. Fino further acknowledged that the past medical records show that the knee fracture itself was in dispute among the doctors. One of the doctors had concluded that Hammett had suffered a contusion, not a fracture.

Dr. Fino also agreed on cross-examination that it was important for him to know whether Hammett had previous low back pain. Dr. Fino stated that at his first visit with Hammett, Hammett denied having any previous low back pain. Dr. Fino noted that at the next visit, Hammett then mentioned having some previous low back pain related to kidney stones. On cross-examination, Dr. Fino also later acknowledged a hospital record from August 3, 2014, about four months before the accident, where Hammett had complained of sacroiliac pain. Dr. Fino explained that the sacrum is basically the five fused bones located at the base of the spine in the lower back. Dr. Fino acknowledged that the hospital record indicated that X-rays had been performed that showed mild degenerative changes in Hammett's sacroiliac joint. Dr. Fino agreed that degenerative changes are those changes in the body that occur over time. Dr. Fino further acknowledged that the area where the degenerative changes were found is the same area where Hammett is claiming issues from the accident. Dr. Fino indicated, however, that the medical record did not indicate that there was substantial degeneration of Hammett's lumbar spine and that X-rays are not very accurate to diagnose issues in the back.

After seeing Hammett on July 13, 2015, Dr. Fino immediately requested and received Hammett's past medical records that were related to his injury from the

accident. On July 22, 2015, Hammett then met with Dr. Fino again. Dr. Fino testified that he stopped treating Hammett's low back pain with the Ultram tablets at that time because they were not providing sufficient relief. Dr. Fino instead prescribed Norco, which is the "next step higher" from the Ultram tablets, to better control Hammett's low back pain. Dr. Fino stated that he had also decided at that time to proceed with a transforaminal epidural steroid injection series to treat Hammett's low back pain. Dr. Fino explained that he had determined that there were some disk bulges and tears in Hammett's lumbar spine. Dr. Fino also suspected that there was a pinched nerve. The injections were to help with that. Dr. Fino further testified again that it was his opinion, within a reasonable degree of medical probability, that this injury and the treatment needed for it were related to the motor vehicle accident.

Dr. Fino then testified that regarding Hammett's neck, he had determined that the disks were not an issue, there were no pinched nerves, and trigger point injections had not helped. Dr. Fino therefore explained that through the process of elimination, he believed that the facet joints, which are at the back of the neck and help you twist the neck, were causing the pain. Dr. Fino stated that the treatment plan for Hammett's neck pain was therefore a right C5 through C7 medial branch block. Dr. Fino explained that the neck has several joints on each side that give you the ability to twist your neck, extend it, and bend it. And each of those joints has small nerves going to that joint to give it feeling. The nerves also relay joint pain to your brain. What Dr. Fino was therefore trying to do with the block was to put numbing medicine in to block the nerve to that joint.

On August 11, 2015, Dr. Fino performed the first transforaminal epidural steroid injection on Hammett's lumbar spine. Dr. Fino's records from that day also show that Hammett was to receive a prescription for hydrocodone to be filled in ten days but at a decreased strength from that which he had been taking. The record indicates that Hammett stated that he needed the refill within five days. When Hammett was asked why he needed the refill within five days when he was not due for a refill until ten days, Hammett stated that he had taken more than prescribed on days when his pain was worse. Dr. Fino ultimately agreed that it was okay to send the prescription early but that it would only be sent early that one time.

Dr. Fino was then specifically asked whether he considered someone who asks for a refill four days early to be significant. Dr. Fino replied, "I mean, no." The following exchange then took place:

> Q. You don't consider it to be significant, but you were clear in your records it was only going to happen that one time?
>
> A. Correct.
>
> Q. So it is pretty significant?
>
> A. Again, looking at the big picture it was not overly significant at the time.
>
> Q. Significant enough for you to stipulate it's only happening this time?
>
> A. Yeah, significant - - yeah.

On August 26, 2015, Hammett again went to see Dr. Fino. Dr. Fino noted in the medical records at that time that the transforaminal epidural steroid injection had

provided sixty to seventy percent relief for one to two weeks. Hammett reported that the low back pain started returning, however, and had completely returned to pre-injection levels at that time. Dr. Fino testified that that was a good result but that he would have expected it to have lasted longer. Dr. Fino further noted that the fact that the injection lasted one to two weeks meant that it was only temporary. Hammett's medical records show that the continuing treatment for Hammett's low back pain included increasing the strength of Hammett's Norco medication and scheduling a second transforaminal epidural steroid injection. Hammett's medical records further show that Hammett's neck pain was unchanged from his prior visits. Dr. Fino testified that he was awaiting doing a medial branch block.

On September 1, 2015, Dr. Fino then performed a cervical medial branch block on Hammett, and on September 22, 2015, Dr. Fino performed the second transforaminal epidural steroid injection on Hammett's lumbar spine. On October 6, 2015, Hammett then had a follow-up appointment with Dr. Fino. Hammett reported at that time that the second injection had provided only twenty-five percent relief for two days. Dr. Fino explained that there are several reasons why Hammett was responding poorly to the injection but stated that he believes that the reason is that Hammett is suffering from a disk issue. Hammett also reported at that time that the cervical medial branch block provided him only thirty-five percent relief. Dr. Fino testified that a typical good response to a medial branch block is to receive at least fifty to seventy percent relief to indicate that it is treating the cause of the pain. Dr. Fino stated that experiencing only thirty-five percent relief means that the medial branch block may be treating the partial

cause of Hammett's pain, but not the complete cause. Dr. Fino also asserted that because of Hammett's poor response to the medial branch block, he knew that he did not need to pursue that avenue of treatment any further.

Dr. Fino testified that all of the treatment that he administered was considered to be in the conservative spectrum of care. Dr. Fino further stated that there was no major difference between his diagnoses or treatment protocols than what he has seen with Dr. Sanchez, Dr. O'Shea, Dr. McKernan, and Dr. Seabolt and that at no time did he come to any conclusions or opinions that varied greatly from them.

Hammett's medical records show that on October 14, 2015, Hammett called Dr. Fino's office about a Norco refill and that a prescription was faxed to the pharmacy stating that it was eligible to be refilled on October 22, 2015. Hammett's medical records then show that on October 29, 2015, someone from Dr. Fino's office spoke to the pharmacy and informed them that they will not refill early. Dr. Fino testified that this is another entry where Hammett had taken his medication too early.

Dr. Fino agreed on cross-examination that overuse of hydrocodone is an issue with some patients. Dr. Fino agreed that he therefore has to be really careful about patients coming to see him, getting a prescription for hydrocodone, overusing the medication, and becoming addicted to it. Dr. Fino agreed that before treating someone who comes to see him, he makes the person sign a multi-page statement about not overusing and abusing their medication.

Dr. Fino explained that he gave Hammett the questionnaire on July 13, 2015, when Hammett first came to see him. In the questionnaire, Hammett represented to Dr. Fino

that he was not seeing a psychiatrist or mental health counselor. Hammett also represented to Dr. Fino that he seldom felt the need for higher doses of medication to treat his pain. On cross-examination, Dr. Fino was asked whether that was really true based on Hammett's file. Dr. Fino replied that "in a way it's true; in a way it's not." Dr. Fino explained that Hammett had taken more medication than he was prescribed when Dr. Fino was still trying to adjust his medication. Dr. Fino stated that even though Hammett was not taking his medication exactly as prescribed, Dr. Fino would not characterize Hammett as abusing his medication. Instead, Hammett was controlling his pain. Dr. Fino stated that in other words, he had not given Hammett enough pain medication and that that is also why Hammett came back to adjust the medication. Dr. Fino testified that Hammett was therefore compliant with the treatment that he provided for him.

Dr. Fino also testified on cross-examination that when making notes in the medical records, he differentiates between objective findings and subjective complaints. Dr. Fino stated that objective findings are those over which the patient has little or no control. They include a fracture that can be seen on an X-ray. Dr. Fino stated that subjective complaints, on the other hand, are those that are totally in the patient's control and cannot be proven. They include the location of pain and the severity of pain. Dr. Fino then testified as follows regarding Hammett:

> Q. Doctor, when you were in medical school did you get trained or exposed to malingering or testing for malingering?
>
> A. Yes.

Q.     Can you tell the jury what that means?

. . . .

A.     Malingering is where a patient is putting on that he's having a pain or a medical issue like abdominal pain or back pain or joint pain. And when you ask a person and you examine them, you put it all together and see if there's malingering and you - - again, being in the field so long I could - - I've gotten experience doing that, noticing that in a patient.

Q.     Did you pick up any signs that Mr. Hammett was malingering or in any way faking his pain?

A.     No.

Dr. Fino ultimately testified that the last time Hammett had come in for an office visit was October 6, 2015. Dr. Fino affirmed that he did, however, continue to fill prescriptions for Hammett after that date. Dr. Fino stated that there is nothing else that he can do for Hammett at this point to provide him long-term relief. The only things that Hammett can do are to follow his home exercise program, stay within his lifting limits, and take pain medication. When asked if there is any necessary future treatment for Hammett other than pain medications, Dr. Fino replied that with prescribing pain medications, he would have to see Hammett regularly about every three months for the rest of Hammett's life to make sure that Hammett is compliant with taking his medications and to re-evaluate. Dr. Fino then testified as follows:

Q.     Is the continuing medical needs that he has for the pain medicine and the visits to keep those up, are they consistent with the history, your examinations, your testing, your diagnosis, and your treatment of Mr. Hammett?

A.     Yes.

Q. Are the continuing medical needs in line with medical research on the matter?

A. Yes.

Q. Is the future treatment in the best interest of Mr. Hammett?

A. Yes.

Q. What happens if he goes off his pain meds?

A. He can - - as you saw once with his headache situation, things can get aggravated and his pain could be worse. Again, the pain helps him lower his pain - - pain medicines help him lower the pain, help him continue to work. So if he wanted to continue to work - - he has some disk bulges that are causing pain, so he'll be limited in his activities. He'll be limited in sitting, standing, and walking. His sleep will be affected negatively. So that's a potential problem.

Q. The pain medications that he's prescribed now, will they ever change for the rest of his lifetime?

A. Again, he will need pain medicines. We will adjust it, but he will need those lifelong because the disks do not resolve, especially in the lower back there. So I think this is a long-term treatment.

Dr. Fino then affirmed that Hammett is going to have permanent impairment as a result of the accident. And Dr. Fino testified that all of his opinions have been based on a reasonable degree of medical probability.

Hammett testified that since the accident, he can no longer ride a motorcycle. He is also no longer able to do various physical activities with his son. Hammett stated that he continues to have back pain and headaches, as well as right shoulder, right leg, and right knee pain. His headaches are mostly controlled by taking BC Powder, but for the other pains, he currently takes Tramadol, Norco, and Temazepam, which are all prescribed by Dr. Fino.

After considering the foregoing evidence, a jury ultimately found Juarez one hundred percent responsible for the accident and awarded Hammett damages, including damages for past and future physical pain and mental anguish, past and future physical impairment, and past and future medical expenses. The trial court rendered judgment on the verdict, and Juarez subsequently filed a motion for new trial based, in part, on newly discovered evidence. Juarez argued that after the jury had returned its verdict, Hammett's counsel revealed that Hammett was absent from the trial because he was undergoing medical treatment for pain medication withdrawal symptoms.

The trial court held a hearing on Juarez's motion for new trial. At the hearing, Hammett testified that he was at a rehab clinic during the trial. He stated that he believes that the rehab clinic flew him there the week before the trial. When asked if he notified his attorney that he was not going to be at the trial, Hammett replied that because everything happened "pretty quick," he was only able to leave a message for his attorney before he left. Hammett stated that he also talked to his former wife but that he did not want anyone to know where he was going or what he was doing.

Hammett testified that he went to the rehab clinic to resolve an addiction to the medication Norco. Hammett stated that he had taken Norco since the accident and that he had also taken it before the accident. Hammett asserted, however, that he was no longer using it. When asked if he was still using a "Norco-like product," Hammett replied that at one time he was using a medication called Hysingla, which was not covered by his insurance and much more expensive than Norco. In fact, he said that on that day, he was taking medications for seizures and something for sleep and that he still

had "like a couple Hysinglas left just in case a real bad day." When asked when the last time it was that he had taken Norco, he replied that it "[c]ould have been about a month ago maybe because Hysingla is basically the same thing." When asked if he was still taking Norco or a Norco derivative then, he replied, "No. I'm taking a hydrocodone derivative, but only if need be and only if it becomes over - - overbearing, I guess." Hammett denied that he had had any relapses.

Juarez's attorney testified that he learned that Hammett was not going to be attending trial on the morning of the trial. He found out when Hammett's counsel came in and said that his client was not going to be there. It was never disclosed to him before trial that Hammett had an addiction to pain medication or that Hammett was going to be in rehab because of his addiction to pain medication. Hammett did not supplement his discovery responses to disclose his rehabilitation treatment until post-trial discovery. When asked what efforts he engaged in before trial to determine or ascertain evidence related to Hammett's medical treatment, he replied, "Written discovery." Juarez's attorney stated that Hammett's addiction to pain medication would have been a relevant and material piece of evidence at trial because Hammett was seeking damages for future medical and the medical doctor that testified on Hammett's behalf said that Hammett was going to need future medical in the form of those pain medications.

The motion for new trial was overruled by operation of law.

## Discussion

A party seeking a new trial on grounds of newly discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the

trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). We review a trial court's denial of a motion for new trial for an abuse of discretion. *Id.*

To satisfy the first element, Juarez must have demonstrated to the trial court that the newly discovered evidence had come to her knowledge since the trial. *See id.* It is essentially undisputed that Juarez did so. At the motion-for-new-trial hearing, Hammett testified that he was at a rehab clinic during the trial of this case to resolve his addiction to the medication Norco. Hammett stated that before going to the rehab clinic, he did not tell anyone that he was going there. He stated that he did leave a message for his attorney and talk to his former wife but that he did not want anyone to know where he was going or what he was doing. Juarez's trial counsel then testified as follows:

> Q.     Was it ever disclosed to you before trial that Mr. Hammett had an addiction to a pain medication?
>
> A.     It was not.
>
> Q.     Before trial were you informed that Mr. Hammett was going to be in rehab because of his pain addiction?
>
> A.     No, I was not.
>
> Q.     At what point did Mr. Hammett supplement his discovery responses to disclose his rehabilitation treatment?
>
> A.     On the original discovery it was not. That didn't come through until the second set of discovery, the post-trial discovery.

Juarez therefore satisfied the first element by demonstrating to the trial court that the newly discovered evidence came to her knowledge since the trial.

To satisfy the second element, Juarez must have demonstrated to the trial court that her failure to discover the evidence sooner was not due to lack of diligence. *See id.* Juarez contends that she did so by presenting her trial counsel's testimony at the motion-for-new-trial hearing that the newly discovered evidence was not disclosed before trial even though it was responsive to written discovery requests.

Hammett first argues that Juarez has not shown due diligence in procuring the evidence through written discovery. Hammett notes that Juarez has not pointed to any specific discovery request to which the evidence would be responsive. Under Rule of Civil Procedure 194.2(j), however, "in a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case," a party may request disclosure of "all medical records and bills that are reasonably related to the injuries or damages asserted or, in lieu thereof, an authorization permitting the disclosure of such medical records and bills." TEX. R. CIV. P. 194.2(j). And the record here shows that Juarez served requests for disclosure on Hammett.

Hammett further argues that Juarez has not shown due diligence in procuring the evidence because when Juarez discovered from Hammett's counsel on the morning of trial that Hammett would be out of state due to a medical emergency, Juarez did not request additional information as to the medical emergency or seek a continuance to conduct additional discovery about it. Under Rule of Civil Procedure 193.5, however, Hammett had the duty to supplement his discovery responses, *see id.* R. 193.5, and Juarez

was entitled to rely on Hammett to comply with his duty. We therefore conclude that Juarez satisfied the second element by demonstrating to the trial court that her failure to discover the evidence sooner was not due to lack of diligence.

To satisfy the third element, Juarez must have demonstrated to the trial court that the newly discovered evidence is not cumulative, *see Waffle House, Inc.*, 313 S.W.3d at 813, and it is essentially undisputed that Juarez did so. Hammett argues, however, that to satisfy this element, Juarez must have also demonstrated to the trial court that the newly discovered evidence would not be used merely for impeachment purposes. *See, e.g., Springer v. Am. Zurich Ins. Co.*, 115 S.W.3d 582, 586-87 (Tex. App.—Waco 2003, pet. denied) (stating that moving party must show that evidence is not merely cumulative to that already given and does not tend only to impeach testimony of adversary). And Hammett asserts, "[Juarez's] only desire for a new trial is to launch a smear campaign against [Hammett's] character by misconstruing his admittance into a rehabilitation facility as an admission that he was abusing his pain pills."

Even assuming that Hammett's argument that Juarez must have demonstrated to the trial court that the newly discovered evidence would not be used merely for impeachment purposes is correct, however, the newly discovered evidence that Hammett was at a rehab clinic during the trial of this case to resolve his addiction to Norco would not be used merely for impeachment purposes. At a minimum, the evidence is directly relevant to Hammett's future physical pain and medical expenses. For these reasons, we conclude that Juarez satisfied the third element.

Finally, to satisfy the fourth element, Juarez must have demonstrated that the newly discovered evidence was so material that it would probably have produced a different result if a new trial were granted. *See Waffle House, Inc.*, 313 S.W.3d at 813. Juarez contends that the evidence that Hammett underwent treatment for his addiction to prescription pain medication would have, in all probability, resulted in a different verdict and judgment in this case. Hammett, however, argues that only the jury's award of future medical expenses would have been affected by the admission of the evidence.

The majority of the evidence presented in this case was related to Hammett's medical treatment after the accident. Furthermore, a significant portion of the evidence was about controlling Hammett's pain, which included Dr. Fino's testimony regarding Hammett's past and future medical needs. Dr. Fino did not know, however, that Hammett was dependent on his prescription pain medications and was seeking medical treatment for that addiction. The newly discovered evidence would therefore impact Dr. Fino's testimony.

Hammett also argues that the newly discovered evidence would not be admissible because the trial court already concluded that any such evidence would be inadmissible under Rule 403. On the morning of the first day of trial, Hammett's counsel noted that they had not gone through any kind of motion in limine at pretrial and asked if the trial court wanted to address that. The trial court asked Hammett's counsel if there was anything that he was worried about. Hammett's counsel replied that he would ask that there be "no mention or any allegation that [Hammett] was not taking his prescription medications according to the doctor's instructions or that he's abusing his pain pills."

Hammett's counsel further stated that there was "really just no evidence for it." The trial court responded that it thought that unless substantial relevance could be shown, Rule 403 took care of that.

Under Rule 403, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. When the trial court made the foregoing statement, the evidence in this case had not yet been presented, and the trial court was also not aware of the newly discovered evidence. Furthermore, for all the reasons previously discussed, we conclude that the newly discovered evidence would not be inadmissible under Rule 403. We therefore conclude that Juarez satisfied the fourth element.

Having satisfied all four elements, we hold that the trial court abused its discretion in failing to grant Juarez's motion for new trial. We reverse the trial court's judgment and remand this case to the trial court for a new trial.


REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Senior Justice Scoggins[1]
Reversed and remanded
Opinion delivered and filed May 15, 2019
[CV06]



---

[1] The Honorable Al Scoggins, Senior Justice of the Tenth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.